# EXHIBIT A

FILED DATE: 7/31/2018 4:07 PM   2018L008219

| | | |
|---|---|---|
| 2120 - Served | 2121 - Served | **FILED** |
| 2220 - Not Served | 2221 - Not Served | 7/31/2018 4:07 PM |
| 2320 - Served By Mail | 2321 - Served By Mail | DOROTHY BROWN |
| 2420 - Served By Publication | 2421 - Served By Publication | CIRCUIT CLERK |
| Summons - Alias Summons | (06/28/18) CCG 0001 | COOK COUNTY, IL |
| | | 2018L008219 |

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Colliers Bennett & Kahnweiler LLC d/b/a Colliers Intl

(Name all parties)    Case No.

v.

Aurora Health Care, Inc.

Case No. 2018L008219

Serve: Registered Agent Office
Michael Grebe
750 W. Virginia Street
Milwaukee, WI 53204

☑ SUMMONS    ☐ ALIAS SUMMONS

To each Defendant:

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance and pay the required fee within thirty (30) days after service of this **Summons**, not counting the day of service. To file your answer or appearance you need access to the internet. Please visit www.cookcountyclerkofcourt.org to initiate this process. Kiosks with internet access are available at all Clerk's Office locations. Please refer to the last page of this document for location information.

If you fail to do so, a judgment by default may be entered against you for the relief requested in the complaint.

To the Officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than thirty (30) days after its date.

**E-filing is now mandatory for documents in civil cases with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit https://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider. If you need additional help or have trouble e-filing, visit http://www.illinoiscourts.gov/FAQ/gethelp.asp.**

7/31/2018 4:07 PM DOROTHY BROWN

Witness: _____

Atty. No.: 61609

Atty Name: Charles A. Valente

Atty. for: Plaintiff

Address: 500 North Dearborn Street, 2nd Floor

City: Chicago,    State: IL

Zip: 60654

Telephone: (312) 755-5700

Primary Email: cvalente@kaplansaunders.com

Secondary Email: hotoole@kaplansaunders.com

Tertiary Email: courtpapers@kaplansaunders.com

DOROTHY BROWN, Clerk of Court

Date of Service: _____
(To be inserted by officer on copy left with Defendant or other person):

Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois    cookcountyclerkofcourt.org

Page 1 of 2

FILED
7/31/2018 4:07 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018L008219

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

COLLIERS BENNETT &
KAHNWEILER LLC d/b/a
COLLIERS INTERNATIONAL,

      Plaintiff,

v.

AURORA HEALTH CARE, INC.,

      Defendant.

Case No.    2018L008219

**JURY DEMANDED**

### COMPLAINT AT LAW

Plaintiff Colliers Bennett & Kahnweiler LLC (doing business as Colliers International), for

its Complaint against Defendant Aurora Health Care, Inc., states as follows:

### BACKGROUND

1.    Plaintiff Colliers Bennett & Kahnweiler LLC (doing business as Colliers

International) ("Colliers") is a leader in global real estate, offering comprehensive services to

investors, property owners, tenants, and developers. Among other things, Colliers provides

commercial real estate brokerage, advisory, and consulting services for its clients.

2.    In August 2015, Colliers was retained by Defendant Aurora Health Care, Inc.

("Aurora"), a company that provides health care services throughout eastern Wisconsin and

northern Illinois, to provide real estate brokerage, advisory, and consulting services with respect

to 51 properties then leased by Aurora and its subsidiaries pursuant to sale leaseback transactions

that they had entered into in the last several years (the "Sale Leaseback Properties"). Specifically,

Colliers was tasked with analyzing opportunities regarding the Sale Leaseback Properties and then

executing real estate transactions concerning those properties, including potentially the re-

FILED DATE: 7/31/2018 4:07 PM  2018L008219

purchase of those properties, lease restructures, or the negotiation of new sale leaseback agreements or self-financing agreements.

3.      Colliers devoted substantial time and resources to develop a strategy for Aurora's Sale Leaseback Properties, relying on its institutional knowledge and experience in the real estate industry. Based on its expertise and confidential and proprietary analyses, Colliers developed a plan to allow Aurora to repurchase properties then being leased from Welltower Properties, Inc. ("Welltower"), which would result in potential savings to Aurora of hundreds of millions of dollars.

4.      On April 28, 2017, approximately twenty months after Colliers was engaged and began its work on behalf of Aurora, Aurora terminated the Agreement without cause, despite having repeatedly praised Colliers and its work product throughout the course of Colliers's engagement. At the time of the termination, Colliers had armed Aurora with the information it needed to negotiate a favorable deal with Welltower and had provided Aurora with substantial, confidential sophisticated analyses of Aurora's options for financing the transactions. The decision to terminate Colliers was simply a thinly-veiled effort to avoid paying Colliers the commissions that would otherwise be due to it under the parties' Agreement.

5.      Although it terminated Colliers's engagement, Aurora did not return or delete Colliers's confidential strategic plans or financial analyses prepared on its behalf. Instead, in violation of the Agreement, Aurora executed upon Colliers's confidential strategy and relied upon the detailed financial analyses prepared by Colliers to negotiate and execute an approximately $430 million deal to purchase 18 properties from Welltower, a transaction that closed in or around January 2018. Aurora further relied upon Colliers's confidential analyses and advice in determining how to fund the transaction.

FILED DATE: 7/31/2018 4:07 PM  2018L008219

6.    Aurora's use of Colliers's confidential strategic plans and proprietary financial analyses to complete the Welltower transactions violated the Agreement's confidentiality provision. Moreover, Aurora violated the Agreement and the duty of good faith and fair dealing – a duty implied in the Agreement by controlling Wisconsin law – in terminating Colliers in order to avoid paying it commissions.

### PARTIES, JURISDICTION, AND VENUE

7.    Colliers Bennett & Kahnweiler LLC is a limited liability company with its principal place of business located in Illinois, where Colliers performed substantially all of its services related to this matter.

8.    Aurora is a Wisconsin corporation which provides health care services throughout eastern Wisconsin and northern Illinois.

9.    This Court has jurisdiction over this matter pursuant to 735 ILCS 5/2-209 because Aurora regularly transacts business in the State of Illinois and the contract at issue was negotiated and entered into in the State of Illinois.

10.    Venue is proper in Cook County, Illinois pursuant to 735 ILCS 5/2-101 because the transaction at issue occurred, at least in part, in Cook County, Illinois.

### AURORA'S REQUEST FOR PROPOSAL

11.    In December 2014, Aurora issued a Request for Proposal ("RFP") to a select group of organizations, including Colliers, for assistance in developing and implementing a comprehensive facilities optimization plan and facilities strategy covering all owned and leased real estate and facilities of the Aurora Health Care system.

12.    At the time of the RFP, Aurora's operations encompassed more than 250 geographic sites in Wisconsin and Illinois, including 14 acute-care hospitals and a psychiatric

3

FILED DATE: 7/31/2018 4:07 PM    2018L008219

hospital, 159 physician clinic facilities, the largest home health care organization in Wisconsin, over 70 retail pharmacies, and other health care and related services. Aurora had retained the same real estate consultants for many years and yet, it had been unable to identify a viable strategy for reducing its significant real estate expenditures.

13.    Colliers submitted a detailed response to the RFP, highlighting among other things, its extensive experience in advising health care systems with respect to their real estate needs and its comprehensive approach to analyzing the clinical and operational needs of health care systems.

14.    Following its response to the RFP, Colliers, along with several other firms visited Aurora to present their ideas in person. Aurora informed Colliers that its presentation was the most creative and thoughtful of all the firms which presented. Following these presentations, Aurora decided to engage Colliers.

### THE REAL ESTATE SERVICES AGREEMENT

15.    On August 3, 2015, Aurora and Colliers entered into a Real Estate Services Agreement, pursuant to which Colliers was to provide Defendant with commercial real estate brokerage advisory and consulting services. (A copy of the Agreement is attached as Exhibit A.)

16.    Specifically, Aurora sought to have Colliers work with its clinical operations staff to develop criteria to evaluate the performance of 51 Sale Leaseback Properties then operated by Aurora.

17.    As part of this work, Colliers was to provide consulting services, including among other things: (i) the development of confidential and proprietary clinical and financial metrics to enable Aurora to evaluate the performance of the 51 Sale Leaseback Properties, as that performance related to the facilities' support of Aurora's clinical operations; and (ii) the evaluation of the financial aspects of the Sale Leaseback transactions to determine whether there were cost

4

reduction or capital generation opportunities and to recommend improvements to material lease terms for the 51 Sale Leaseback Properties. (See Ex. A, at Ex. B.)

18.     Pursuant to the terms of the Agreement, Colliers was to be paid a total of $100,000 for consulting services, $50,000 of which was payable within 30 days of execution of the agreement. Colliers was also to be paid fees for performing brokerage services by the owner, buyer or seller of any of the 51 Sale Leaseback Properties for which Colliers provided strategic execution services, in an amount based on standard market practices as determined by Colliers and its affiliates, in an amount consistent with the normal practices in each local market. (Ex. A, at Ex. C.) Colliers would deduct $50,000 from any brokerage fees to which it became entitled and would waive the second $50,000 payment in the event that it generated in excess of $50,000 in brokerage fees. (Ex. A, at Ex. C.)

19.     Aurora was well aware that Colliers's consulting fee was small in light of the scope of work requested but that Colliers had agreed to this fee because of the potential to earn significant brokerage fees in the event that Aurora executed on Colliers's strategy.

20.     The parties also agreed that they would maintain the confidentiality of the other's proprietary, confidential, and secret information, both during the term of the Agreement. Moreover, neither party could use the other's proprietary, confidential, and secret information after the termination of the Agreement. Specifically, Paragraph 6.7 of the Agreement states:

> Confidentiality. Each party hereto covenants and agrees that, during the term of this Agreement and at all other times after the termination hereof, it will neither disclose nor permit the disclosure of, whether directly or indirectly, to any person or entity, **or use for its own benefit**, or cause or induce others to do the same, any proprietary, confidential or secret information or documents of or pertaining to the other party without the prior written consent of the other party.

(Ex. A, ¶ 7 (emphasis added).)

5

FILED DATE: 7/31/2018 4:07 PM    2018L008219

## COLLIERS PROVIDES ITS EXPERTISE AND CONFIDENTIAL ANALYSES AND STRATEGIC ADVICE TO AURORA

21.     Between August 2015 and February 2017, Colliers devoted thousands of hours to analyzing the 51 Sale Leaseback Properties. Over this time period, Colliers analyzed property-level data for the 51 Sale Leaseback Properties as well as copies of each of their 51 leases and called upon its own proprietary knowledge to develop a confidential strategy for Aurora to enable it to achieve significant cost-savings or cash-generation.

22.     Colliers's work with Aurora was loosely divided into two functions. In the first, Colliers worked with Aurora's operational staff to develop confidential metrics and models to evaluate the operational performance of the 51 Sale Leaseback Properties, which would allow Colliers and Aurora to identify the best opportunities for significant savings. In the second, Colliers developed a confidential, strategic action plan to reduce the facility costs and Aurora's overall cost of capital by prioritizing those facilities with the highest combined facility performance score and the highest cost-savings or cash-generating opportunity.

### Colliers's Prepares Financial Models to Aurora's Real Estate Performance

23.     Colliers's first challenge was to understand the current performance of Aurora's real estate portfolio so that it could identify opportunities for financial improvement and enhancement of Aurora's ability to serve the needs of its patients. To do this, Colliers began gathering the necessary data to determine an appropriate, effective strategy and the next steps forward for Aurora.

24.     Specifically, Colliers focused on, for each of the 51 Sale Leaseback Properties:

        (i)     Aurora's business needs,
        (ii)    characteristics of the communities in which Aurora operated, including the population's demographics,
        (iii)   the mix of payors for Aurora's patients,
        (iv)    Aurora's patient satisfaction scores,

FILED DATE: 7/31/2018 4:07 PM    2018L008219

         (v)     Aurora's relative value unit (*i.e.*, a measure of the amount of work required to treat a patient),

         (vi)    Aurora's space utilization and floor plans,

         (vii)   rental rate benchmarks,

         (viii)  building and monument signage,

         (ix)    transportation, and

         (x)     costs of operation (including insurance, landscaping, energy, and other operating expenses).

25.     Colliers used this data, along with its experience in maximizing the cost savings and benefits of health care systems' real estate portfolios, to build a software tool and model to evaluate to identify how each of Aurora's mission critical facilities was then performing and which of these facilities offered the best options for cost savings or cash generation, in effect marrying the facility performance with the real estate operations in order to determine the best path forward. Colliers's model ultimately helped Aurora identify which of the 51 facilities provided the greatest opportunities.

26.     Although certain of the data upon which Colliers's models relied may have been known outside of Colliers or Aurora, the significance of certain data points and the culmination of Colliers's analysis of this information allowed Colliers to help Aurora determine which properties to address and how to focus its real estate priorities. In other words, Colliers's analysis of the particular data that it requested from Aurora enabled Colliers to make recommendations to Aurora about what the financial implications of various scenarios with respect to the 51 Sale Leaseback Properties were, including the potential pursuit of different leasing options or negotiation for the purchase of certain properties.

27.     In addition to analyzing each of these factors for the 51 Sale Leaseback Properties, Colliers also reviewed and analyzed each of the 51 leases and analyzed the strengths and weaknesses of each landlord. Colliers's confidential analysis of the landlords' potential weaknesses gave further leverage to Aurora in its future lease restructure negotiations.

FILED DATE: 7/31/2018 4:07 PM   2018L008219

28.     Ultimately, Colliers, relying on its institutional knowledge and data analytics capabilities, scored each property and conducted analyses to determine which facilities to prioritize and how to garner the maximum amount of savings. This scoring system and Colliers's recommendation arising from that scoring was confidential and proprietary. Colliers would not have provided its confidential and proprietary analyses and strategic recommendations to Aurora absent the expectation that Aurora would continue to retain Colliers as its broker or otherwise cease relying upon Colliers's work product.

### Colliers Develops Additional Models and Identifies the Significant Value of the "True Lease" Provisions

29.     Concurrently, Colliers took a deeper dive into planning analytical models for the information that it had gathered and performed additional confidential and/or proprietary analyses to develop execution strategies which would allow Aurora to achieve significant savings. Colliers's goal at this point was to assist Aurora in determining which properties to acquire, at what price, and to analyze options for Aurora to re-engineer the capital structures on an asset by asset basis.

30.     For each of the 51 Sale Leaseback Properties, Colliers employed additional confidential and/or proprietary analyses, including:

(i)     RLO Analysis,
(ii)    Book valuations,
(iii)   Discounted cash-flow analysis,
(iv)    Landlord break-even analysis,
(v)     Residual value analysis,
(vi)    Amortization tables,
(vii)   CTL financing sensitivity and comparison analysis,
(viii)  Bond financing sensitivity and comparison analysis,
(ix)    Mortgage financing sensitivity and comparison analysis,
(x)     Lease financing sensitivity and comparison analysis,
(xi)    Buy all cash financing sensitivity and comparison analysis,
(xii)   Alternative / CTL financing sensitivity and comparison analysis,
(xiii)  Debt / equity impact analysis,
(xiv)   Lease vs own analysis,

8

FILED DATE: 7/31/2018 4:07 PM    2018L008219

    (xv)    Cap rate arbitrage sensitivity analysis,
    (xvi)   Sublease recovery analysis,
    (xvii)  Landlord returns analysis,
    (xviii) Headquarters expansion analysis,
    (xix)   EBITDA impact analysis,
    (xx)    True lease buyout analysis and impact,
    (xxi)   Purchase option buy-out analysis,
    (xxii)  ROFR analysis,
    (xxiii) Lease Buyout analysis, and
    (xxiv) FASB changes and impact.

31.    Colliers's decision to analyze these factors was based on its knowledge and experience in the real estate industry and its unique perspective in analyzing a client's real estate and business needs. In this regard, Colliers's extensive expertise in analyzing the real estate needs and opportunities for health care systems was critical. The extent and depth of the analyses performed is unique to Colliers and is one of the reasons that clients seek out Colliers's services.

32.    Colliers also continued to analyze the landlord vulnerabilities that Aurora could leverage to its economic benefit, and continued to work on its proprietary, client-specific financial analytics. In addition to the foregoing analyses, Colliers explored creative financing alternatives for Aurora.

33.    Most significantly, during this deeper analysis of the lease provisions for certain of the properties, Colliers identified a previously unrealized opportunity which would enable Aurora to unwind the assets at significant discounts via a "True Lease" provision.

34.    At Aurora's direction, Colliers performed thousands of hours of analysis concerning unwinding Aurora's extensive sale leaseback portfolio. Through this analysis, Colliers identified a previously unknown way for Aurora to save hundreds of millions of dollars.

35.    When Aurora hired Colliers, Aurora's Sale Leaseback Portfolio properties were subject to complex long-term sale leaseback agreements with very high cost of capital. In the past, Aurora's real estate consultants and Michael Zeka, its outside counsel at Quarles & Brady LLP,

9

FILED DATE: 7/31/2018 4:07 PM   2018L008219

were unable to find ways to unwind these complex, long-term, costly agreements. This was one of the reasons Aurora turned to Colliers – a high end real estate services company – to help find ways to unwind these costly agreements. Neither Zeka nor Aurora had recognized the potential in these provisions, and as a result, Colliers had to explain the provisions and their impact on the potential negotiations with Welltower to Aurora and Zeka.

36.     Colliers realized that the "True Lease" provisions in the sale leaseback agreements between Welltower and Aurora gave Aurora a significant advantage in negotiations due to an expected change in GAAP. Per the "True Lease" provisions, if Welltower and Aurora could not resolve certain accounting issues through good faith efforts, Aurora could either: (i) repurchase the leased property; or (ii) assume the ownership position that it would have had if the lease had not been executed. The formulas included in the leases for unwinding the transactions and allowing Aurora to purchase the properties were very favorable to Aurora.

37.     Colliers realized what Aurora's attorney and other real estate professionals had not, namely that GAAP principles were due to change in the next few years, and the expected changes to GAAP principles could allow Aurora to invoke the True Lease provisions. Colliers analyzed the various options available to Aurora due to this expected change to GAAP, which included: (i) repurchasing a group of 16 properties (the "Welltower Properties") in the sale leaseback portfolio by (ii) leveraging the "True Lease" Provisions in the Welltower Properties' leases that arguably allowed Aurora to terminate those leases based on changes to the way such leases were treated under GAAP; and (c) reducing Aurora's cost of capital for the Welltower Properties by entering into new sale leaseback transactions on better terms, financing the properties itself, or entering into other arrangements to reduce the costs associated with the properties.

FILED DATE: 7/31/2018 4:07 PM   2018L008219

38.     Colliers also recognized and explained to Aurora that these "True Lease" provisions severely limited Welltower's ability to sell the properties because of the uncertainty and risk that Aurora would invoke the provision. This potential invocation of the True Lease provisions left Welltower vulnerable in its negotiations with Aurora, putting Aurora in a strong position to negotiate with Welltower to unwind its leases and enter into new, more favorable arrangements.

39.     Colliers's realization that the "True Lease" provision was a significant bargaining chip led to further analysis by Colliers of various lease restructure options, potential acquisition of the property and related financing options, as well as analysis of various execution strategies for the financial and operational issues resulting from maintaining the status quo. Colliers used its expertise and institutional knowledge to prepare confidential and proprietary analyses involving the nominal cash impact of the remaining lease obligations, the net present value of the cash impact over the remaining lease options, and the impact on the cost of capital. Colliers also evaluated how the unwinding of the Sale Leaseback Properties could improve Aurora's flexibility to dispose of, alter, renovate, or expand facilities. These analyses reflecting the impact of the "True Lease" provisions and ultimately, the recommendations that Colliers made to Aurora regarding the recommended range of offers to be made for the properties and the financial impact to Aurora based on those purchase prices were confidential and proprietary to Colliers.

40.     During a June 6, 2016 presentation, Colliers and Aurora discussed the "True Lease" provision opportunity and its confidential analyses of Aurora's options with respect to the Sale Leaseback Properties. During that meeting, Colliers explained that it had analyzed the potential economic impact of "unwinding" all or a portion of the Sale Leaseback Properties. Colliers then compared the resulting figures to the impact of remaining in the leases over a 20 year period. Finally, Colliers analyzed how unwinding the Sale Leaseback properties for the 16 Welltower

11

FILED DATE: 7/31/2018 4:07 PM  2018L008219

properties could improve Aurora's future flexibility, with respect to the disposal, alteration, renovation, or expansion of the facilities.

41.     Not only did Colliers provide Aurora with the data necessary to allow Aurora to choose the best path forward, it also conveyed information that gave Aurora guidelines about suitable starting and ending points for negotiations.

42.     Aurora was aware that Colliers's analysis and proposed strategy was considered confidential and proprietary to Colliers.

43.     Following this June 2016 meeting, Aurora directed Colliers to move forward with negotiations with Welltower to attempt to repurchase the 16 properties.

44.     At Aurora's direction, Colliers commenced negotiations with the owner of the Welltower Properties to buy back the properties. These negotiations involved numerous phone calls and an in-person meetings with Welltower's chief executive officer. During those negotiations, Welltower acknowledged that it had severe exposure under the True Lease Provisions. Further, based on that exposure and Colliers's work, Welltower made a promising offer to sell the Welltower Properties to Aurora. If simply accepted, this offer would have allowed Aurora to realize hundreds of millions of dollars in savings.

45.     Following its receipt of this offer, Aurora requested that Colliers undertake additional financial analysis with respect to the Welltower properties, including the analysis of the capital lease debt levels on Aurora's balance sheet, the reengineered debt levels, and the property conditions. Colliers devoted substantial additional time and resources to meet Aurora's demands.

46.     Again, Colliers built multiple iterations of financial models in order to provide Aurora with the necessary information to develop a suitable, strategic range for a counteroffer and the re-engineering of the capital structure. Through these analyses, Colliers provided valuable

FILED DATE: 7/31/2018 4:07 PM   2018L008219

confidential information to Aurora regarding a range of potential counteroffers and how those different counteroffers would impact Aurora's debt capacity, operating margins, and other key metrics, both in the short and long-term.

47.     Aurora also requested that Colliers conduct additional analyses relating to additional properties then leased from Welltower, including in particular a facility located in Summit, Wisconsin. After reviewing the Summit lease, Colliers again identified an option to purchase the property of which Aurora was previously unaware.

48.     Colliers again met with Aurora in September 2016, providing Aurora with further detailed, confidential, and proprietary financial analysis about the potential scenarios with respect to the Sale Leaseback Properties then leased to Aurora by Welltower, including a proposed purchase price and related analysis of the cost structure depending on whether there was a buy-out of the Welltower properties or if the properties were financed through a new lease structure. Colliers also presented its confidential and proprietary analysis of Aurora's options with respect to the Summit property.

49.     Colliers also disclosed to Aurora its confidential, proprietary analysis of the potential savings resulting from a reduction in rent at the Welltower properties versus maintain the current rental structure, indicating targets for the potential savings in rent. Colliers further provided Aurora a confidential analysis of the potential cash generation opportunities afforded by the Welltower property leases, disclosing its analysis of maintaining the status quo compared to a traditional 15-year lease, and different credit scenarios.

50.     Colliers responded to repeated requests for additional analyses from Aurora throughout the fall of 2016 and into early 2017. Those confidential and proprietary analyses helped Aurora to understand its long-term liabilities, debt, and to develop a better understanding of the

FILED DATE: 7/31/2018 4:07 PM  2018L008219

financial implications of potential counteroffers to Welltower, as well as to understand its options with respect to the Summit property.

51.     Colliers would not have prepared or shared its confidential, proprietary analyses with Aurora had it known that Aurora intended to terminate their relationship and to use Colliers's analyses to conduct negotiations with Welltower without Colliers's involvement and without Colliers's potentially earning a commission on any such transaction.

### AURORA TERMINATES THE AGREEMENT WITHOUT CAUSE

52.     **In early 2017, Aurora stopped returning Colliers's calls and emails. At that point, Aurora had the confidential analyses and information that it needed from Colliers's financial models and expert execution advice and could step in, armed with Colliers's confidential research, advice, and negotiating expertise to complete the transaction.**

53.     On April 28, 2017, Aurora advised Colliers that it was terminating the Agreement without cause, pursuant to Section 6.4 of the Agreement. While Aurora paid an additional $50,000 fee required under the Agreement, no commissions were paid to Colliers because no transactions had been entered into at that point in time.

54.     Aurora terminated Colliers under the Agreement with the intention of cheating Colliers out of commissions on the transactions for which Colliers provided consulting services.

55.     Because Colliers's research, advice, and expertise that it had shared with Aurora was confidential, Section 7 of the Agreement barred Aurora from using that information for its own benefit.

### AURORA UTILIZES COLLIERS'S CONFIDENTIAL ANALYSES AND EXECUTES ON COLLIERS'S STRATEGY TO PURCHASE 18 OF THE SALE LEASEBACK PROPERTIES

56.     Following its termination of the Agreement, Aurora moved forward with negotiations to repurchase the Welltower properties, utilizing the confidential financial analyses

14

FILED DATE: 7/31/2018 4:07 PM    2018L008219

and strategic plans developed by Colliers.

57.     Aurora ultimately purchased 18 Welltower properties in early 2018, for a total purchase price of approximately $430 million.

### COUNT I – BREACH OF CONTRACT

58.     The Agreement is a valid, enforceable contract, which, among other things, protected the confidentiality of Colliers's proprietary, confidential, and secret information and documents. (See Ex. A, Section 7.)

59.     Colliers provided Aurora with its proprietary, confidential, and secret documents and information in the course of its consulting work for Aurora. Aurora was aware that the information that Colliers provided was developed using Colliers's unique expertise in the real estate field and its institutional knowledge and skill.

60.     Once Aurora terminated Colliers, it no longer had the right under the Agreement to use Colliers's proprietary, confidential, or secret documents or information in negotiating with Welltower.

61.     Despite this obligation to refrain from using Colliers's proprietary, confidential, or secret documents or information, Aurora did exactly that, relying on Colliers's work product to obtain an advantage in its negotiations with Welltower.

62.     As a result of Aurora's misuse of Colliers's proprietary, confidential, and secret information for its own benefit in violation of Section 7 of the Agreement, Aurora was able to achieve cost-savings and benefits of hundreds of millions of dollars.

63.     Colliers complied with all its obligations under the Agreement or else they are excused.

15

WHEREFORE, Colliers respectfully requests that this Court enter judgment in its favor and against Aurora Health Care, Inc. in an amount in excess of $10,000,000, plus attorney fees, and costs of suit, prejudgment interest, and grant such other relief as it deems just and appropriate.

## COUNT II – BREACH OF CONTRACT

64.     The Agreement is a valid, enforceable contract.

65.     Aurora owed a duty of good faith and fair dealing under the Agreement, which prevented it from taking any actions that would frustrate the parties' reasonable expectations under the Agreement.

66.     Aurora breached the duty of good faith and fair dealing, which is implied in the Agreement by controlling Wisconsin law, by strategically exploiting the termination provision in the Agreement to avoid paying Colliers millions of dollars in Execution Services fees that would otherwise be incurred without taking steps to protect Colliers's confidential information shared with Aurora. Instead, Aurora compounded its breach of good faith and fair dealing by intentionally continuing to use the confidential and proprietary analyses prepared by Colliers and following Colliers's strategy in pursuing the purchase of the Welltower properties.

67.     When the parties signed the Agreement, they did not reasonably expect that Aurora would exploit the Agreement by invoking the termination clause after Colliers performed substantially all the required legwork but very shortly before a major transaction closed and allowing for Aurora to benefit from confidential analyses performed by Colliers.

68.     Specifically, the parties did not reasonably expect or contemplate that if (a) Colliers performed excellent services and identified ways to save Aurora hundreds of millions of dollars; *and* (b) secured a proposal that would allow Aurora to immediately realize those hundreds of millions of dollars in savings; *and* (c) performed extensive Execution Services, including strategic

16

FILED DATE: 7/31/2018 4:07 PM   2018L008219

and financial analysis, long after completing its Consulting Services obligations; *then* (d) Aurora would terminate the Agreement shortly before a deal, but after Aurora received substantially all of the information and analysis that it needed to complete that deal.

69.    Aurora repeatedly assured Colliers that it would allow Colliers to continue to serve as the exclusive provider of Execution Services under the Agreement. Aurora also repeatedly praised Colliers's work and never said anything negative about this work.

70.    Aurora led Colliers to believe that Colliers would continue to be retained to complete the Execution Services to obtain thousands of hours of free (or substantially discounted) strategic implementation guidance, recapitalization information, and other corresponding financial analysis regarding its Sale Leaseback Properties.

71.    Aurora's termination of the Agreement was arbitrary, unreasonable, and contrary to the spirit of the Agreement. Through its timing of the termination, Aurora attempted to reap substantially all the benefits of the Agreement without any of the material financial obligations in violation of the duty of good faith and fair dealing.

72.    Colliers complied with all its obligations under the Agreement or else they are excused.

WHEREFORE, Colliers respectfully requests that this Court enter judgment in its favor and against Aurora Health Care, Inc. in an amount in excess of $10,000,000, plus attorney fees, and costs of suit, prejudgment interest, and grant such other relief as it deems just and appropriate.

**Plaintiff Colliers Bennett & Kahnweiler LLC d/b/a Colliers International demands trial by jury on all claims so triable.**

COLLIERS BENNETT & KAHNWEILER LLC
d/b/a COLLIERS INTERNATIONAL

BY: /s/ *Charles A. Valente*
　　　　One of its Attorneys

Charles A. Valente
Heather Kuhn O'Toole
KAPLAN SAUNDERS VALENTE
　& BENINATI, LLP
500 North Dearborn Street, 2nd Floor
Chicago, Illinois 60654
(312) 755-5700
Firm No. 61609

FILED DATE: 7/31/2018 4:07 PM  2018L008219

18

DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL



## AURORA AND COLLIERS REAL ESTATE SERVICES AGREEMENT

THIS REAL ESTATE SERVICES AGREEMENT (hereinafter referred to as the "Agreement") is made and entered into this [21] day of August, 2015, by and between Aurora Health Care, Inc. (hereinafter referred to as "Aurora "), and Colliers, Bennett & Kahnweiler LLC, d/b/a Colliers International (hereinafter referred to as "COLLIERS").

WHEREAS, Aurora, including any Aurora subsidiaries, currently leases approximately fifty (50) facilities pursuant to sale leaseback transactions they entered into over the last several years. Such facilities (individually, a "Sale Leaseback Property" and collectively the "Sale Leaseback Properties") are more fully described on Exhibit A attached hereto; and

WHEREAS, COLLIERS is engaged in the business of providing commercial real estate brokerage, advisory and consulting services; and

WHEREAS, Aurora  desires to employ COLLIERS to provide certain commercial real estate brokerage, advisory and consulting services as more fully described on Exhibit B (collectively referred to herein as "Services") to Aurora , including any Aurora subsidiaries, in connection with the Sale Leaseback Properties upon and subject to the terms and conditions of this Agreement;

NOW THEREFORE, in consideration of the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Aurora and COLLIERS now agree to the following terms and conditions:

1.      Appointment.  Aurora hereby appoints COLLIERS to provide the Services and COLLIERS hereby accepts such appointment, on the terms and conditions hereinafter provided herein.

2.      Authority.

2.1.      General.  COLLIERS shall have no right or authority, express or implied, to commit or otherwise obligate Aurora in any manner whatsoever except to the extent specifically provided herein or specifically authorized by Aurora in writing.

2.2.      Delegation.  Aurora acknowledges that for any locations in areas where COLLIERS has employed an affiliate or third party service provider (collectively referred to as "Affiliate"), COLLIERS, at its discretion, but subject to the provisions of Paragraph 3.4 hereof, may delegate some duties hereunder to such Affiliate, provided that (i) prior to such delegation, COLLIERS notifies Aurora in writing of its intent to so delegate and provide such information on the Affiliate as requested by Aurora, (ii) such Affiliate and the scope of the delegation of COLLIERS' duties to such Affiliate shall be subject to the prior reasonable approval of Aurora; (iii) any such Affiliate shall agree in writing to be bound by the terms of this Agreement that are applicable for each Affiliate's specific project and role with COLLIERS, and (iv) COLLIERS shall, in each case, remain primarily responsible for the duties performed by such Affiliate.

3.      Scope of Services.

3.1.      Description.  COLLIERS shall provide the Services in a professional and good faith manner in accordance with all applicable laws and customary industry standards and as more particularly identified and described in the applicable Project Authorization Form.

3.2.      Scope.  The scope of this Agreement shall be limited to the Services as they relate to the Sale Leaseback Properties. Any work undertaken pursuant to this Agreement shall be done in accordance with the provisions of Exhibits B and C ("Fee Schedule"), respectively attached hereto and made a part hereof by this reference.

Colliers and Aurora Health Care MSA

FILED DATE: 8/3/2018 10:59 AM   2018L008219

FILED DATE: 8/3/2018 10:59 AM    2018L008219

3.3.  Staffing.  COLLIERS shall provide experienced and appropriate staffing for all Services in a commercially reasonable fashion, including the use of its employees, consultants and affiliates, as appropriate.

3.4.  Exclusive.  Aurora and COLLIERS acknowledge that COLLIERS is the exclusive provider of the Services for the Sale Leaseback Properties and, except as otherwise provided herein, Aurora agrees not to engage any other real estate services entity to provide any of those Services during the term of this Agreement, provided, however, that if so directed by Aurora, COLLIERS, at its expenses, shall retain the services of The Boerke Company, or such other firm as selected by Aurora in its sole discretion, to assist in the implementation of those Services described in Item 2 of Exhibit B.

3.5.  Aurora Approval of Negotiations.  All lease and owned property negotiations shall be subject to Aurora's final approval, in its sole and absolute discretion.

4.  Terms and Conditions.

4.1.  It is understood and agreed that the Services performed by COLLIERS may include advice and recommendations, but all decisions in connection with the implementation of such advice and recommendations shall be the responsibility of, and made by, Aurora.

4.2.  Aurora acknowledges that although COLLIERS's staff may include attorneys, accountants, engineers and other professionals, the Services being rendered hereunder are consulting in nature and are not legal, accounting or other professional services.  Specifically, these services do not constitute an engagement to provide audit, compilation, review, or attestation services as described in the pronouncements on professional standards issued by the American Institute of Certified Public Accountants.

4.3.  Aurora recognizes and agrees that it shall be COLLIERS' right during the term of this Agreement to utilize such staffing as it deems appropriate in providing the Services to ensure that the Services are provided in an expeditious and economical manner.

5.  Fees and Commissions.  Aurora shall compensate COLLIERS for the Services in the amount and manner set forth on Exhibit "B" attached hereto and by reference herein made a part hereof (hereinafter referred to as the "Fee Schedule") or as may be mutually agreed between the parties and set forth in the applicable [**Project Authorization Form.**]

6.  Term and Termination.

6.1.  Term.  This Agreement shall become effective on the date hereof and, unless sooner terminated in accordance with Paragraph 6.2 below, shall continue in full force and effect for twenty-four (24) months, ending on the last day of the 24th full month (the "Initial Term") and shall thereafter continue for successive terms of one (1) year each unless terminated in writing pursuant to Paragraph 6.2.2 below.

6.2.  Termination.  This Agreement shall terminate upon the occurrence of any of the following events:

1.  For Cause (as hereinafter defined); or

2.  Without Cause; or

3.  After the expiration of the Initial Term, either party may terminate this Agreement for any reason upon ten (10) days prior written notification.

6.3.  Termination for Cause.  "For Cause" shall mean (i) a default by COLLIERS in any material respect in the performance or observance of any covenant, or term of this Agreement, provided that the breach shall be material and adverse to Aurora  and that COLLIERS shall fail either (x) to cure, terminate or remove

such default within five (5) days after written notice (containing reasonably sufficient details) thereof from Aurora to COLLIERS, or (y) if such default cannot be cured within the aforesaid five (5) day period, to commence curative action within such five (5) day period and to make substantial and continued progress to cure such default within such additional period as shall be reasonable to cure such default, provided COLLIERS is capable of curing such default and such cure may be accomplished without damage or expense to Aurora by reason of the cure and, in all events, such cure is effected within such five (5) days after written notice thereof from Aurora to COLLIERS; or (ii) if COLLIERS engages in negligence, or commits intentional misconduct or fraud.

        6.4.   <u>Termination without Cause</u>. Either party may terminate this Agreement with ten (10) days prior written notice to the other party. If this Agreement is so terminated, COLLIERS shall be entitled to complete all transactions for which it has substantially completed negotiations with a landlord of a Sale Leaseback Property at the time of termination. COLLIERS shall be entitled to all consideration as provided herein upon completion of the transactions described in this paragraph. COLLIERS shall provide Aurora, at least ten (10) days prior to the effective date of termination, written notification as to what specific transactions it is currently involved with. COLLIERS and Aurora shall then mutually agree in writing, acting in good faith, to the list of transactions for which COLLIERS is entitled to receive compensation under the terms of this Paragraph.

        6.5.   <u>Effect of Termination</u>. Upon termination of this Agreement, COLLIERS shall, as soon as practicable but in no event later than the thirtieth (30th) day after the effective date of termination, furnish all such information and take all such action as Aurora shall reasonably require in order to effectuate an orderly and systematic ending of COLLIERS's duties and activities hereunder.

        6.6.   <u>Compensation Owed to COLLIERS Upon Termination</u>. Upon termination, all compensation, reimbursements and any other amounts owed by Aurora to COLLIERS under this Agreement earned by COLLIERS prior to the date of such termination or shall be paid promptly by Aurora , as more particularly described in the applicable Project Authorization Form(s).

        6.7.   <u>COLLIERS's Obligations and Rights after Termination</u>. Upon the expiration or termination of this Agreement, COLLIERS shall complete negotiations for all transactions or projects then underway at the time of expiration or termination only upon the specific written request of Aurora, in accordance with the terms of this Agreement, after which time COLLIERS shall not have any further obligations hereunder. COLLIERS shall be entitled to all consideration as provided herein upon completion of the obligations called for by this paragraph.

        7.   <u>Confidentiality</u>. Each party hereto covenants and agrees that, during the term of this Agreement and at all other times after the termination hereof, it will neither disclose nor permit the disclosure of, whether directly or indirectly, to any person or entity, or use for its own benefit, or cause or induce others to do the same, any proprietary, confidential or secret information or documents of or pertaining to the other party without the prior written consent of the other party.

        8.   <u>Cooperation</u>. Aurora shall promptly and fully cooperate with COLLIERS in the performance by COLLIERS of its services hereunder, including, without limitation, timely access to data, information and personnel of Aurora. Aurora shall supply COLLIERS with copies of all documents and bills necessary for COLLIERS to carry out its work under this Agreement. Aurora shall be responsible for the performance of its personnel and agents and for the accuracy and completeness of all data and information provided to COLLIERS for purposes of the performance by COLLIERS of its services hereunder.

        9.   [Intentionally deleted.]

        10.   <u>Indemnification</u>.

        10.1.   <u>Indemnification by Aurora</u>. Aurora shall indemnify, defend and hold COLLIERS and its parent, subsidiary and affiliated entities, and each of their respective managers, members, officers, directors, employees and agents harmless from and against any and all liabilities, losses, interest, damages, injuries, causes of action, claims, settlements, judgments, demands, costs or expenses (including, without limitation,

Colliers and Aurora Health Care MSA

FILED DATE: 8/3/2018 10:59 AM   2018L008219

FILED DATE: 8/3/2018 10:59 AM   2018L008219

court costs and reasonable attorneys' fees) (collectively, "Liabilities") arising out of or related to, (i) any real estate transaction of Property, and (ii) the use of, or access to, the Property by any person pursuant to this Agreement, only to the extent such Liabilities are caused by the negligence or willful misconduct by Aurora. The provisions of this Paragraph 10.1 shall survive the expiration or earlier termination of this Agreement.

      10.2.    <u>Indemnification by COLLIERS</u>. COLLIERS shall indemnify, defend and hold Aurora and its parent, subsidiary and affiliated entities, and each of their respective managers, members, officers, directors, employees and agents harmless from and against any and all Liabilities brought by third parties to the extent caused by (i) COLLIERS' negligence or willful misconduct, and (ii) claims made by any licensed third-party broker or independent contractor based on and arising from the acts or promises of COLLIERS and with whom COLLIERS has had dealings with respect to the Services. The provisions of this Paragraph 10.2 shall survive the expiration or earlier termination of this Agreement.

11.    <u>Limitation of Liability.</u> COLLIERS shall, at all times, act in good faith and use commercially reasonable efforts to meet the obligations set forth in this Agreement. COLLIERS shall not be liable to Aurora for any mistake of fact or error in judgment so long as it has acted in good faith in meeting the terms and conditions set forth herein. In the event COLLIERS will be working within a real estate property database where all data previously entered was done so without the assistance of COLLIERS, COLLIERS will not be held liable for its accuracy, provided COLLIERS promptly shall notify Aurora of any inaccuracies in such data discovered by COLLIERS. In addition, COLLIERS shall not be responsible for the accuracy or reliance on the information provided by Aurora to COLLIERS in populating any such databases. Notwithstanding the foregoing or anything contained herein, at no time shall the total liability of COLLIERS to Aurora for any failure to timely notify Aurora of impending critical dates or for any other breach hereof or any violation of this Agreement relating to the Services, exceed the total fees paid to COLLIERS under this Agreement for the previous twelve (12) months, or such lesser period if twelve (12) months have not yet expired.

12.    [Intentionally deleted.]

13.    <u>Limitation on Actions</u>. No action, regardless of form, relating to this engagement, may be brought by either party more than one year after the cause of action has accrued, except that an action for non-payment may be brought by a party not later than one year following the date of the last payment due to such party.

14.    <u>Independent Contractor</u>. It is understood and agreed that each of the parties hereto is an independent contractor and that neither party is, nor shall be considered to be, an agent, partner, fiduciary or representative of the other. Neither party shall act or represent itself, directly or by implication, in any such capacity in respect of the other or in any manner assume or create any obligation on behalf of, or in the name of, the other.

15.    <u>Miscellaneous</u>.

      15.1.    Should COLLIERS deem it necessary or advisable or should local laws require, COLLIERS shall have the right to solicit the cooperation of local licensed real estate brokers in accordance with the provisions of Paragraphs 2.2 and 3.4 hereof. COLLIERS shall have the right to utilize its subsidiary and affiliated corporations in accordance with the provisions of Paragraph 2.2 and 3.4 hereof.

      15.2.    All offerings, inquiries, proposals and solicitations received by Aurora from brokers, landlords or any other party, concerning the Services under this Agreement, shall be referred to COLLIERS and, subject to Paragraph 3.4, all negotiations shall be conducted by COLLIERS or under COLLIERS's direction, in each case in conjunction with Aurora's legal counsel and subject to Aurora's review and final approval.

      15.3.    Subject to Aurora's prior reasonable consent, COLLIERS and its parent, subsidiary and affiliated entities may represent potential property owners, purchasers, sellers, tenants, subtenants or assignees in transaction(s) relating to any new purchase or lease transaction so long as COLLIERS provides written notice to Aurora, and in COLLIERS' professional judgment, the interests of Aurora will continue to be served properly by COLLIERS.

15.4.    Aurora acknowledges that it is solely responsible for determining the presence of toxic, contaminated, or hazardous substances or conditions at property to be leased or purchased by Aurora ; and making any and all other legally required disclosures relating to the Property.

16.    <u>Notices</u>.  Any notice or other communication required or permitted to be made or given under this Agreement, shall be in writing and shall be deemed to be sufficiently given if in writing and sent by United States certified or registered mail, electronic mail with return receipt, telecopier with confirmation, or by overnight courier with postage prepaid addressed to the respective party's address set forth below or to such other address as designated by the party:

        If to Aurora:

        Aurora Health Care, Inc.
        750 W. Virginia Street
        Milwaukee, WI  53204
        Attention: Steve Huser

        with a copies to:

        Aurora Health Care, Inc.
        750 W. Virginia Street
        Milwaukee, WI  53204
        Attention:  Shelly Hart and Michael Connor

        If to COLLIERS:

        200 S. Wacker Drive, Suite 700
        Chicago, IL 60606
        Attention: Alain LeCoque | Principal – alain.lecoque@colliers.com

        with a copy to:
        6250 North River Road, Suite 11-100
        Rosemont, IL 60018
        Attention: Bill Fausone | President – william.fausone@colliers.com

17.    <u>Entire Agreement and Amendment</u>.  This Agreement constitutes the entire agreement between Aurora and COLLIERS and supersedes all prior discussions.  All prior negotiations between the parties are merged into this Agreement; and there are no promises, agreements, conditions, undertakings, warranties or representations, oral or written, express or implied, between the parties other than as herein set forth. No modifications of this Agreement will be effective unless made in writing and signed by both Aurora and COLLIERS.

18.    <u>Severability</u>.  If any provision of this Agreement, or the application of such provision to any person or circumstance, shall be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall in no way be affected thereby.

19.    <u>Assignment</u>.  COLLIERS may not assign its rights and obligations under this Agreement without the prior written consent of Aurora, which consent may be withheld in Aurora's sole discretion.

20.    <u>Captions</u>.  Captions are for descriptive purposes only and shall not control or alter the meaning of this Agreement as set forth in the text.

21.    <u>Waiver</u>.  No waiver of any of the provisions hereof shall be effective unless it is in writing and signed by the party against whom the waiver is asserted.  Any such written waiver shall be applicable only to the specific instance to which it relates and shall not be deemed to be a continuing waiver or waiver of any future matter.

22. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

23. <u>Successors</u>. Except as herein otherwise specifically provided, this Agreement shall be binding upon and inure to the benefit of the parties and their successors and permitted assigns.

24. <u>Pronouns</u>. Whenever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in either the masculine, the feminine or the neuter gender shall include the masculine, feminine and neuter.

25. <u>Attorneys' Fees</u>. If any party commences an action against the other party to interpret or enforce any of the terms of this Agreement or as the result of a breach by the other party of any terms hereof, the losing (or defaulting) party shall pay to the prevailing party all reasonable attorneys' fees, costs and expenses incurred in connection with the prosecution or defense of such action, including those incurred in any appellate proceedings, and whether or not the action is prosecuted to a final judgment.

26. <u>Further Assurances</u>. Each party agrees to execute and deliver any and all additional instruments and documents and do any and all acts and things as may be necessary or expedient to more fully effectuate this Agreement and carry on the business contemplated hereunder.

27. <u>Equitable Remedies</u>. In the event of a breach or threatened breach of this Agreement by any party, the remedy at law in favor of the other party will be inadequate and such other party, in addition to any and all other rights which may be available, shall accordingly have the right of specific performance in the event of any breach, or injunction in the event of any threatened breach of this Agreement by any party.

28. <u>Force Majeure</u>. Inability of either party to commence or complete its obligations hereunder by the dates herein required resulting from delays caused by strikes, picketing, acts of God, war, governmental action or inaction, emergencies or other causes beyond either party's reasonable control which shall have been timely communicated to the other party, shall extend the period for the performance of the obligations for the period equal to the period(s) of any such delay(s).

29. <u>Third Party Rights</u>. The provisions of this Agreement are for the exclusive benefit of the parties to this Agreement and no other party (including without limitation, any creditor of Aurora or COLLIERS) shall have any right or claim against Aurora or COLLIERS by reason of those provisions or be entitled to enforce any of those provisions against Aurora or COLLIERS.

30. <u>Survival</u>. All covenants, agreements, representations and warranties made herein or otherwise made in writing by any party pursuant hereto shall survive the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

31. <u>Remedies Cumulative</u>. The rights and remedies given in this Agreement and by law to a non-defaulting party shall be deemed cumulative, and the exercise of one of such remedies shall not operate to bar the exercise of any other rights and remedies reserved to a non-defaulting party under the provisions of this Agreement or given to a non-defaulting party by law.

32. <u>No Waiver</u>. One or more waivers of the breach of any provision of this Agreement by any party shall not be construed as a waiver of a subsequent breach of the same or any other provision, nor shall any delay or omission by a non-defaulting party to seek a remedy for any breach of this Agreement or to exercise the rights accruing to a non-defaulting party of its remedies and rights with respect to such breach

33. <u>Governing Law</u>. The nature, validity and effect of this Agreement shall be governed by and construed and enforced in accordance with laws of the State of Wisconsin, or if related to a specific property or properties owned or leased by Aurora, then in such case this Agreement will be governed in accordance with the laws of the State where the Property is located.

FILED DATE: 8/3/2018 10:59 AM    2018L008219

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be duly executed by their duly authorized officers where applicable as of the date first above written.

**Colliers Bennett & Kahnweiler LLC,**
**d/b/a Colliers International**

By:

Name:

Its:

**Aurora Health Care, Inc.**

By:

Name: Michael Lappin

Its: Secretary



Colliers and Aurora Health Care MSA

FILED DATE: 8/3/2018 10:59 AM   2018L008219

COLLIERS's commission, and in the event that Counterparty is unwilling to pay the applicable amount, Aurora will fully cooperate with COLLIERS by representing to Counterparty in writing that Aurora requires for COLLIERS to be paid the standard market commission; and, in the event that COLLIERS determines no such fee will be paid by the Counterparty, then Colliers shall invoice Aurora for such applicable fee payable, and Aurora shall promptly pay such applicable fee to COLLIERS according to the fee payment schedule, as invoiced and set forth by COLLIERS. COLLIERS shall determine at the outset of any negotiations with a Counterparty if there is a probability the Counterparty will or will not pay the brokerage fee and promptly so inform Aurora. Colliers will continually update Aurora during all active projects as to whether or not it expects the Counterparty to pay a brokerage fee.

Generally, brokerage fees for lease restructurings, extensions or asset sales are payable by the property owner (market brokerage fees). However, it is not as uniformly the case in the medical office property market as it is in the traditional office and industrial property markets. The following is representative of the amounts of typical fees:

Asset acquisitions: 3-4% of sale price
Lease restructures: 4% of net rental rates on extended lease term
Acquire asset/new sale leaseback: 3-4% of sale price
Asset Sales:          3% to 4% of sale price
Sublease:             4% of sublease value
Lease Buyout:         10% of buyout savings

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Colliers Bennett & Kahnweiler LLC    )
d/b/a Colliers International,         )
                                 )
         Plaintiff,        )     Case No.
                                 )
    v.                       )
                                 )
Aurora Health Care, Inc.,        )
                                 )
         Defendant.     )

AFFIDAVIT OF RUHEE DIVGI IN SUPPORT OF
DEFENDANT AURORA HEALTH CARE, INC.'S NOTICE OF REMOVAL

STATE OF WISCONSIN    )
                       ) ss.
MILWAUKEE COUNTY    )

        RUHEE DIVGI, having first been duly sworn on oath, states under penalty of perjury as follows:

        1.    I make this affidavit upon personal knowledge in support of Defendant Aurora Health Care, Inc.'s ("Aurora") Notice of Removal in the above-captioned matter.

        2.    I have worked for Aurora for four years. I am currently employed by Defendant as Senior Counsel, Corporate Law. In my capacity as Senior Counsel, Corporate Law, I am familiar with Aurora's corporate structure.

        3.    Aurora is a Wisconsin non-stock corporation. Aurora was incorporated in the State of Wisconsin and maintains its principal place of business in the State of Wisconsin.

4.      Aurora's corporate headquarters is located at 750 West Virginia Street, Milwaukee, WI 53204.

5.      On August 8, 2018, Aurora was served with the Summons and Complaint at Law ("Complaint") in the matter stylized as *Colliers Bennet & Kahnweiler LLC d/b/a Colliers International v. Aurora Health Care, Inc.*, Case No. 2018L008219, which case is pending in the Circuit Court of Cook County, Illinois. I am not aware of any other filings in this matter.

6.      In the Complaint, Plaintiff Colliers Bennett & Kahnweiler, LLC d/b/a Colliers International ("Colliers") alleges two causes of action against Aurora, both for breach of contract, and seeks damages in excess of $10,000,000, plus attorneys' fees, costs, interest, and any other "just and appropriate" relief.

Ruhee Divgi

Subscribed and sworn to before me
this _10th_ day of _September_ , 2018

Notary Public, State of Wisconsin
My Commission ~~expires~~ is permanent



2

# EXHIBIT C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| Colliers Bennett & Kahnweiler LLC <br> d/b/a Colliers International,     ) <br> ) <br> ) <br> Plaintiff,     ) <br> ) <br> v.     ) <br> ) <br> Aurora Health Care, Inc.,     ) <br> ) <br> Defendant.     ) | Case No. |

### AFFIDAVIT OF LEILA NADIM SAHAR
### IN SUPPORT OF AURORA HEALTH CARE, INC.'S NOTICE OF REMOVAL

STATE OF WISCONSIN     )
                          ) ss.
MILWAUKEE COUNTY     )

LEILA N. SAHAR, having first been duly sworn on oath, states under penalty of perjury as follows:

1.     I am an attorney with the law firm Kravit, Hovel & Krawczyk, s.c., located at 825 N. Jefferson St., Milwaukee, Wisconsin 53202, and I am one of the attorneys representing Defendant Aurora Health Care, Inc. ("Aurora") in this matter. I make this affidavit upon personal knowledge in support of Aurora's Notice of Removal in the above-captioned matter.

2.     I have attempted to determine the membership of Plaintiff Colliers Bennet & Kahnweiler LLC d/b/a/ Colliers International ("Colliers") by reviewing information about Colliers' membership available in the public domain.

3.     Based upon publicly available information, and upon information and belief, Colliers is a citizen of Delaware, Illinois, and Washington.

4.     According to the corporate records I reviewed, the members of Colliers are CBK Holding I, Inc. ("CBK") and Colliers International USA, LLC ("Colliers International").

5.     CBK was incorporated in Delaware and maintains its principal place of business in Illinois.

6.     Colliers International was incorporated in Delaware and maintains its principal place of business in Washington. Based upon the information available to me in the public domain, I believe Colliers International's members are citizens of Illinois and Washington.

Leila Nadim Sahar

Subscribed and sworn to before me
this _6__ day of _September_ 2018

Notary Public, State of Wisconsin
My Commission expires _12/8/19_.

2