| | |
|---|---|
| COLLIERS BENNETT & KAHNWEILER LLC, | |
| Plaintiff, | No. 18 CV 6144 |
| v. | Judge Manish S. Shah |
| AURORA HEALTH CARE, INC., | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

Defendant Aurora Health Care, Inc. hired plaintiff Colliers Bennett & Kahnweiler LLC to analyze its existing real-estate agreements and recommend ways for Aurora to cut costs and increase revenue. Colliers came up with a plan that would save Aurora hundreds of millions of dollars. Instead of using Colliers to execute that plan—which would have entitled Colliers to a substantial commission—Aurora terminated the agreement and went through with Colliers's proposal on its own. Colliers alleges this amounted to a breach of the contract and of the implied duty of good faith and fair dealing. Aurora moves to dismiss. For the reasons discussed below, the motion is granted.

## I.    Legal Standards

A complaint may be dismissed pursuant to Rule 12(b)(6) if it fails to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In other words, a "complaint

must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). All reasonable inferences are drawn in favor of the non-movant. *Squires-Cannon v. Forest Preserve Dist. of Cook Cty.*, 897 F.3d 797, 802 (7th Cir. 2018).

## II.    Background

In August 2015, defendant Aurora Health Care, Inc. retained plaintiff Colliers Bennett & Kahnweiler LLC to provide real-estate brokerage, advisory, and consulting services for 51 leased properties. [4-1] ¶ 2.[1] The agreement divided Colliers's work into two phases: consulting services and strategic execution services. *Id*. ¶ 22; [14-1] at 10. In the first phase, Colliers was to develop metrics to allow Aurora to evaluate the performance of its facilities; evaluate Aurora's sale leaseback transactions—including identifying which facilities were performing, as well as cost-reduction and capital-generation opportunities; and recommend improvements to the material lease terms for the sale leaseback properties. [14-1] at 10. In exchange for its consulting services, Aurora would pay Colliers $100,000, half of which was payable within thirty days of executing the agreement. *Id*. at 10; [4-1] ¶ 18. In the second phase, Colliers would—to the extent Aurora requested—acquire assets; restructure leases; execute new sale leasebacks; or sell, lease, or sublease assets or lease buyouts. [14-1] at 10. In exchange for its strategic execution services, Colliers would receive a

---

[1] Bracketed numbers refer to entries on the district court docket, and page numbers refer to the CM/ECF header placed at the top of filings.

standard market commission. *Id.* at 11; [4-1] ¶ 18. Aurora was aware that Colliers agreed to a low consulting fee because of the potential to earn significant brokerage fees if Aurora followed through with Colliers's proposed strategy. [4-1] ¶ 19.

The agreement contained the following confidentiality provision,

Each party hereto covenants and agrees that, during the term of this Agreement and at all other times after the termination hereof, it will neither disclose nor permit the disclosure of, whether directly or indirectly, to any person or entity, or use for its own benefit, or cause or induce others to do the same, any proprietary, confidential or secret information or documents of or pertaining to the other party without the prior written consent of the other party.

*Id.* ¶ 20. It also provided that "[n]o action, regardless of form, relating to this engagement, may be brought by either party more than one year after the cause of action has accrued." [14-1] at 5.

Colliers, relying on its institutional knowledge and experience, devoted substantial time and resources to come up with a strategy for Aurora's properties, recommending that Aurora repurchase properties it was leasing from Welltower Properties, Inc. *Id.* ¶ 3. To understand Aurora's real estate portfolio, Colliers focused on things like Aurora's business needs, the characteristics of the communities in which Aurora operated, space utilization and floor plans, rental-rate benchmarks, transportation, and costs of operation. *Id.* ¶¶ 23–24. Combining that data with its experience, Colliers built a software tool and model to evaluate which facilities offered the best options for cost savings or cash generation. *Id.* ¶ 25. Colliers also analyzed the strengths and weaknesses of each landlord, to give Aurora further leverage in future negotiations. *Id.* ¶ 27. Colliers then scored each property and conducted

analyses to determine which facilities to prioritize and to maximize savings. *Id*. ¶ 28. Colliers would not have provided its analyses or recommendations to Aurora if it did not expect that Aurora would either continue to retain Colliers as a broker or not rely on Colliers's work product. *Id*.

At the same time, Colliers also planned analytical models for the information it had gathered and performed additional analyses to assist in determining which properties to acquire, at what price, and to analyze options for Aurora to re-engineer its capital structures on an asset-by-asset basis. *Id*. ¶ 29. During this more thorough analysis, Colliers identified an opportunity that enabled Aurora to unwind assets at significant discounts by using the True Lease provisions in the sale leaseback agreements. *Id*. ¶ 33. Colliers realized that an expected change in the Generally Accepted Accounting Principles, which would allow Aurora to invoke the True Lease provisions for the Welltower properties, gave Aurora a significant advantage in its negotiations with Welltower. *Id*. ¶¶ 36–37. Based on that realization, Colliers considered the various options available to Aurora, including repurchasing properties; leveraging the provision in the leases; and reducing costs by entering into a new sale leaseback transaction on better terms, financing the properties itself, or entering into other arrangements. *Id*. ¶ 37. Colliers's plan had the potential to save Aurora hundreds of millions of dollars. *Id*. ¶ 3. Before retaining Colliers, Aurora had used the same real-estate consultants for many years and had never identified a viable strategy to reduce its real-estate expenditures. *Id*. ¶ 35.

Colliers presented its confidential analyses of Aurora's options for financing the transactions in June 2016, giving Aurora the information it needed to negotiate a favorable deal with Welltower. *Id.* ¶¶ 4, 40–41. At Aurora's direction, Colliers began negotiations with Welltower to buy back the properties. *Id.* ¶ 44. During those negotiations, Welltower acknowledged that it had severe exposure under the True Lease provisions and offered to sell the properties to Aurora for a price that would have resulted in hundreds of millions of dollars in savings for Aurora. *Id.* Aurora then requested that Colliers conduct additional financial analyses to develop a strategic range for a counter offer and to reengineer its capital structure, which took Colliers substantial additional time and resources. *Id.* ¶¶ 45, 46. Aurora also asked Colliers to analyze cash-generation opportunities for some other Welltower properties, and Colliers provided Aurora with its analysis of different potential scenarios. *Id.* ¶¶ 47, 49. Colliers continued to respond to Aurora's requests for analyses into early 2017, when Aurora stopped returning Colliers's calls and emails. *Id.* ¶¶ 50, 52. By that time, Aurora had all the analyses, information, and expert advice from Colliers's financial models to complete the transaction with Welltower on favorable terms. *Id.* ¶ 52.

Aurora terminated its agreement with Colliers without cause on April 28, 2017. *Id.* ¶¶ 4, 53. Aurora paid the additional $50,000 fee required under the agreement but did not pay any commissions to Colliers because it had not entered into any transactions. *Id.* Before terminating the agreement, Aurora had continuously praised Colliers for its work product and assured Colliers that it would

continue to utilize its services under the agreement. *Id*. ¶¶ 4, 69. Aurora did not

return or delete Colliers's confidential strategic plans or financial analyses; it relied

on them to negotiate, execute, and fund a $430 million deal to buy 18 properties from

Welltower, a transaction that took place in early 2018. *Id*. ¶ 57.

## III. Analysis

Aurora moves to dismiss Colliers's complaint, arguing that its claims are

untimely, that the information it used was neither confidential nor proprietary, and

that Colliers has failed to identify that information with enough specificity. As alleged

in the complaint, Colliers bases its claims, in part, on Aurora's termination of the

agreement. The parties agreed to bar any action brought more than one year after it

accrued. *See Strauss v. Chubb Indem. Ins. Co.*, 771 F.3d 1026, 1034 (7th Cir. 2014)

(noting that parties "are free to alter the length of a statute of limitations"). Though

a complaint need not anticipate a statute-of-limitations defense, a "litigant may plead

itself out of court by alleging (and thus admitting) the ingredients of a defense." *U.S.*

*Gypsum Co. v. Indiana Gas Co.*, 350 F.3d 623, 626 (7th Cir. 2003). Colliers alleges

that Aurora terminated the agreement on April 28, 2017. It filed this lawsuit on July

31, 2018, rendering any claim that accrued upon termination untimely.

Colliers argues in its response that its claims are based only on Colliers's use

of its confidential information, which did not occur until early 2018. But that is not

all it alleges in its complaint. For example, Colliers asserts,

> Aurora breached the duty of good faith and fair dealing . . . by strategically
> exploiting the termination provision in the Agreement to avoid paying Colliers
> millions of dollars . . . without taking steps to protect Colliers's confidential
> information shared with Aurora. Instead, Aurora compounded its breach of

good faith and fair dealing by intentionally continuing to use the confidential and proprietary analyses prepared by Colliers and following Colliers's strategy.

[4-1] ¶ 66; *see also id*. ¶ 71 ("Aurora's termination of the Agreement was arbitrary, unreasonable, and contrary to the spirit of the Agreement . . . in violation of the duty of good faith and fair dealing."). While the complaint mentions Aurora's subsequent use of Collier's confidential information, it focuses on the termination of the agreement. As currently pleaded, the complaint is about the termination, and that cause of action accrued more than one year before Colliers filed this suit.

Colliers has otherwise adequately alleged a breach of the confidentiality agreement. It asserts that Aurora and Colliers entered into an agreement that prohibited them from using each other's confidential information without consent. It identifies the confidential information at issue—Colliers's analyses, metrics, models, and the scoring system it used to make its recommendation—and alleges that Aurora used that information to negotiate a deal with Welltower, in violation of the agreement. This would be enough to state a claim and give Aurora fair notice of what the claims against it are and the grounds upon which they rest. *See Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010).

Whether Colliers has adequately alleged a breach of the implied covenant of good faith and fair dealing is more difficult. The covenant of good faith that accompanies all contracts is intended as a guarantee against arbitrary or unreasonable conduct. *Foseid v. State Bank of Cross Plains*, 197 Wis.2d 772, 796 (1995). What constitutes a breach of this duty is hard to define, but it encompasses

evading the spirit of the bargain. *Id.* (discussing *In re Chayka*, 47 Wis.2d 102 (1970)). A breach of the good-faith covenant can occur without a breach of a specific provision in the contract, if, for example, it accomplishes exactly what the agreement sought to prevent. *Chayka*, 47 Wis.2d at 107 (finding a breach of good faith where a surviving spouse gave away her property to avoid complying with a joint will she had entered with her late husband). Colliers has failed to plausibly allege anything similar here.

Aurora argues that it merely exercised its right to terminate the agreement without cause, and so its actions cannot amount to a breach. Aurora further points out that Colliers was only to help execute the agreement "[t]o the extent requested by Aurora." [14-1] at 10. Colliers argues in response that Aurora evaded the spirit of the parties' bargain when it terminated the agreement and still relied on Colliers's work product. In other words, according to Colliers, Aurora and Colliers intended that Aurora would either: (1) go forward with Colliers's plan and enlist its help to execute its proposal or (2) not to go through with the plan and terminate the agreement, but that it could not terminate the agreement *and* go forward with the proposal. Colliers asserts that because the parties did not reasonably expect that Aurora could exploit the termination clause in the way it did, its actions breached their intended bargain.

But this is not what the agreement says, and the facts alleged in Colliers's complaint do not support the conclusion that the parties intended to bind themselves in any way not identified in the written contract. In *Chayka*, the contract provided that upon the death of both spouses, their possessions would go to a named third party; the spirit of the bargain was clear from the terms of the written contract. What

Colliers argues to be the spirit of the bargain here is not obvious from the text of the agreement. It requires the additional inference that the parties intended to bind themselves in a way not expressly provided. Colliers may have understood that to have been the bargain it struck, but it has not alleged enough to reasonably infer that Aurora agreed to bind itself in that way. Even assuming Aurora knew it was getting a deal on Colliers's consulting services because Colliers expected to earn brokerage fees down the road, this is not enough to support the conclusion that Aurora agreed to include Colliers or forgo its entire proposal. Because Colliers has not plausibly alleged that Aurora breached the spirit of the bargain, it has failed to state a claim based on the implied covenant of good faith.

## IV. Conclusion

The motion to dismiss, [12], is granted. The complaint is dismissed without prejudice.[2] Colliers has leave to file an amended complaint by February 4, 2019.

ENTER:

_Manish S. Shah_
Manish S. Shah
United States District Judge

Date: January 14, 2019

---

[2] Leave to amend should be freely given when justice so requires. Fed. R. Civ. P. 15(a). "That leave should be 'freely given' is especially advisable when such permission is sought after the dismissal of the first complaint." _Barry Aviation Inc. v. Land O' Lakes Mun. Airport Comm'n_, 377 F.3d 682, 687 (7th Cir. 2004).